Good morning, Your Honors. I'm Katherine Floyd. I'm Katherine Floyd here for Appellant Edgar William Arteaga-Giron. Could I reserve two minutes for rebuttal? THE COURT Mr. Arteaga-Giron is asking this Court to remand for a new trial because the District Court improperly denied him the right to represent himself. I guess the first issue here is what the standard of review is. I'm still having trouble hearing you. The first issue here. You're going to have to talk. That's not a – you have a bad voice this morning. I do. I'm sorry. I do have a sore throat, but – and I always have trouble speaking loudly. I'm sorry. Evidently, the first issue here is what is the appropriate standard of review for this issue. The government argues that it's an abuse of discretion or that it's undecided. I did look at those cases, and they refer back to other cases that say the issue is undecided. But I didn't actually find one that used an abuse of discretion standard of review. Does that make a difference in this case? I don't think it does. I don't think it does make a difference. Why not? What's so clear about this case? What's so clear about this case is that the Court used the wrong and inappropriate reason for denying Mr. Arteaga-Giron his right to represent himself. The Court did – it's important to remember that the Court did, in fact, initially grant him the right to represent himself and then later withdrew it because he said Mr. Arteaga-Giron did not have the ability to represent himself. It's very clear that his decision was based on his opinion that he didn't have the legal ability. He didn't have the legal knowledge or skills. He asked him questions about his proficiency in the English language, whether he had studied the guidelines, whether he had been to law school. These are all inappropriate reasons for denying a defendant the right to represent himself. You're contesting both the sentencing and the earlier refusal to allow him to represent himself? You didn't talk too much in your brief about the sentencing piece. I quoted what was said. But, no, I'm arguing for both, yes. He did reassert his right at sentencing, even though there is no requirement, as the government argues, that a defendant reassert this right at various stages of the proceedings. In fact, there are cases that say that once a defendant asserts his right to represent himself, that could continue into a new trial unless he specifically asks for new counsel. What about the government's sort of semi-waiver argument that he, when the judge asked Mr. Kellogg to take over, he took over and Mr. Archiega never said a word about it? Well, he isn't a lawyer. He doesn't know that he should object, and I don't think it is required. It was clear that the judge was – well, maybe it wasn't clear exactly what was happening at that point, if he was asking standby counsel to take over temporarily or if he was withdrawing the right to represent. Did he issue any orders to your client? Sit down? I don't think so. I think he just said, Mr. Kellogg, please take over. Well, if the Court doesn't have any further questions. Did Mr. Kellogg or your client ever protest that Mr. Kellogg had taken over the case? Well, Mr. Kellogg had been – had requested to withdraw, and that was denied. He was asked to stand by counsel. He did protest at the point of sentence. He started over again. Right. He asked the Court to clarify. During the suppression hearing and during the trial, he didn't. Well, after the suppression hearing, there was a specific order withdrawing. So the really relevant period is during the suppression hearing, I guess. Yes. By acquiescing and, in fact, I gather letting Mr. Kellogg put him on the stand. Yes, he did. He sufficiently acquiesced to sort of implicitly withdraw his request. The Court said, you may sit down. Mr. Kellogg, take over. Cross-examination. Is it fair to look at this case simply as stand-by counsel performing a stand-by counsel function, or is that just hallucinating is really what happened? I think you could perhaps look at it that way for the suppression hearing, but not for the rest of the trial. Because after that, he specifically withdrew the – the – It was specifically withdrawn by that time. Yes. All right. Do you have anything else to say, or would you like to respond to the government? Oh, wait. Thank you, Your Honor. Catherine Kim Frierson on behalf of the United States, and I was counsel below. I think the fairest way to interpret what had happened at the suppression hearing on September 24th at the time that Judge Tanner requested Terry Kellogg to take over would be for the Court to instruct a stand-by counsel to take over procedural matters which Mr. Ortega-Huron was having problems defending. It was clear that even to Terry Kellogg's own mind, the stand – the final ruling of the Court was unclear, because at the end of the suppression hearing, Mr. Kellogg did request explicit clarification. Mr. Kellogg stood up and asked for what the status of Mr. Huron's representation would be for purposes of trial. And it was at that point that Judge Tanner then ruled that he would be withdrawing his initial grant of the right of self-representation. You're not relying on any acquiescence theory. I believe – I said this – I explain the circumstances because I do think that this Court should take a look at whether a waiver had been made. Sandoval, for instance, the prior Ninth Circuit case, made clear that the circumstances could indicate that – circumstances, not express words of a defendant, but the circumstances, behavior and conduct of a defendant could possibly indicate that he had acquiesced to continued representation by counsel and had withdrawn his initial request. Kagan. But the way you just explained and the way the record does seem to show, Mr. Kellogg did not understand it that way, which is why he asked for clarification. He got an order from the Court withdrawing the self-representation decision. So how is there acquiescence? I think there is acquiescence because of the level of cooperation or the level of acceptance that Mr. Ortega-Huron exhibited throughout that suppression hearing. Not only he didn't – What was a defendant supposed to do when the judge told him to sit down? Those are pretty strong words coming from a judge sitting up on, you know, way up there. Yes, Your Honor. It is a command that may be interpreted as being pretty clear, but – When that judge says sit down, does anybody remain standing up? No, Your Honor. Unfortunately, they do not. It is difficult to clarify issues before the Court. However, I think Mr. Ortega-Huron, as exhibited throughout the record, wasn't reticent to assert his rights. He was very forthright with respect to – during the colloquy with respect to Judge Tanner about what he felt about his representation. He said he didn't want Mr. Kellogg there as stand-by – even a stand-by counsel. But the judge insisted he be there. And then the judge told him to sit down and for Mr. Kellogg to take over. So he sort of reached the end of the rope in terms of his assertions. Well, I think you can take also a look at the conduct of Mr. Ortega-Huron before the sentencing hearing, where Mr. Ortega-Huron did not feel any reticence to asserting his right to self-represent for purposes of sentencing once again. So the time had passed, and now he was reasserting it. Which I think I would only raise it for an indication that – of his mindset at the time of the suppression hearing when he sat and actively cooperated with Mr. Terry Kellogg in the presentation of his defense, to the point where Mr. Ortega-Huron, when he took the stand and very readily answered questions directed to him by Mr. Kellogg, made no – made no conflict or raised no objections. What ground would Judge Tanner give in deciding to revoke self-representation status? I would take issue with the appellant counsel's characterization. Judge Tanner never spoke the words ability. I do agree to say I don't think he can. The issue of what he meant by he can, I think, is up for grabs. And that issue had been addressed by this Court prior to before. There is a very illuminating footnote in the decision of Hernandez. In that case, this Court also noted that a district court, in issuing an order refusing to grant a Feretta request, the district court stated, I don't believe he can or is capable. This Court noted that that may actually be ambiguous. You could interpret that as meaning addressing the ability of the defendant to conduct himself in a lawyerly fashion. However, the Court chose to go for a more generous interpretation, saying that it may simply be referring to not fulfilling the elements of what is required of a valid Feretta waiver. I think that is the situation here. Judge Tanner's statement – I think it was later, during the sentencing colloquy on self-representation – on what he actually had done. In fact, I know he can't just from what I have seen. And later he repeated that it was what he did. Well, then the issue is what did Judge Tanner see? I would argue, and the government's position would be that what Judge Tanner saw was a very strange, oblique interaction between the judge and the defendant. As you read the record, it's very clear that the defendant never took it upon the burden to clearly state, I understand and I accept the consequences of what it means to represent myself. Every single one of his answers sort of was – the two of them were ships passing in the night. They never engaged each other directly. And the defendant's answers were so bleak and ambiguous and confusing that it actually drove the government, after the initial Feretta request, to file a motion for a supplemental hearing. That – this issue and this question of whether the defendant had fully and straightforwardly answered and accepted the consequences was raised from the very beginning, and the government – Let me stop you just for a second. You said you moved for a supplemental hearing. Yes, Your Honor. What was the purpose of your request in asking for a supplemental hearing? The purpose of our request was that we as the government had serious concerns whether Mr. Ortega-Heron had straightforwardly, unambiguously – You saw the problem. Yes, Your Honor. And you laid it out for the judge? Yes. And how did the supplemental hearing go? I must concede that the trial court didn't fully adopt, perhaps, the government's recommendations or position. What did the judge do? The judge engaged in a partial – again, a partial questioning of whether Mr. Ortega-Heron continued to desire to represent himself. This was right before the suppression hearing. And at this point, there was sort of almost a very belligerent interaction where the defendant suddenly became very angry and said, I will tell you for the last time I'm going to represent myself. At that point, the trial court then proceeded with the suppression hearing without any ruling and requested that the government proceed with its witness. I raise that because another alternative position for the government – Why ambiguous about that? Ambiguous about – I only say ambiguous because, again, Judge Tanner did not explicitly articulate any grounds – And you said earlier that the defendant's answers were oblique and ambiguous. What's ambiguous about I'm telling you for the last time I'm going to represent myself? That goes to the issue of whether the request was equivocal or unequivocal. And the government's position is not that the defendant's request was unequivocal. I think that clearly indicates that it was unequivocal. He was very sure about himself. The prong that we want to raise the question of is the knowing and voluntary. And the obliqueness of his answers and responses to the trial court raises an issue. There is doubt. It's the defendant's burden to make it very clear. This Court has also – So what you're really saying is something sort of profound, but I don't know that it could be dealt with in a system, which is that when you tell people who don't understand the legal system that the legal system is complicated and you may have trouble with it, they don't really understand that because they don't really understand how complicated it is. But that could be said across the board. Yes, Your Honor. But I think what I'm maybe not successfully getting across is something a little bit different. It's not that we require the defendant to grasp clearly at that point the complexities of the legal process, but at least to tell – for the defendant to tell them – tell the trial court explicitly and clearly that, yes, I understand the consequences, that a lawyer can actually perhaps navigate these procedures better. But – and that I – What's interesting about this case is he kept saying it's not going to make any difference. And, in fact, it didn't make any difference. So he wasn't entirely wrong about that. Well, I think that's the danger. The defendant went – proceeded with his choice under a misconception that a lawyer could not do anything for him. In fact, the lawyer didn't do anything in the end because he apparently didn't have a case, and the lawyer really didn't accomplish anything. I think the lawyer – I think the choice to continue with the representation did do a lot. I think the choice to continue with representation did serve a purpose, which was to prove – to protect the more paramount right here, which is the explicit right to counsel as well as the Fifth Amendment right to a fair trial. But his perception that in his particular case it wasn't going to make a difference may well have been right. But I think that was a wrong conception because what he – what that actually tells the trial court is that, you know what, I'm going to reject your advisement that a lawyer can have better understanding of the procedures and the intricacies of a trial process. What that answer tells us is that Ortega-Heron explicitly rejected that advisement. In some – He may have done so on the basis of the facts of his case, and he may have been right. I'm sorry. He may have done so on the basis of the facts of his particular case. But – And what I understood him to be saying was essentially I'm going to get convicted anyway and I'd rather do it in my own – in my own voice. Yes, Your Honor. I think there is a difference. If I may answer this question, I understand my time is up. There is a difference between not accepting the – what the facts of the case, the consequences would lead to, versus not accepting the fact that a lawyer does know better or know more or have technical knowledge to proceed through a trial process. And I think that's where the problem is. Thank you, Your Honor. Just a couple of brief points. When asked if he understood the charges and the penalties and the dangers, he did clearly say that he understood this right. The other statements he made, I think they simply indicate the defendant's disagreement with the charges, the fact that he was there at all, and then later on his disagreement with the conviction. The acquiescence cases typically involve situations where a defendant vacillated between asserting his right to self-representation and having an attorney represent him. And, in fact, in a lot of those cases, the defendant – or at least the lawyer represented that the defendant explicitly withdrew the Ferretta request. Here, Mr. Archega-Jarron's initial request was unequivocal, and that's what's required. There's no further request necessary, especially if it would be pointless, as it clearly would have been here. And if the Court has no further questions, I would simply ask that there remain in this case for a new trial. I have a couple of questions. Okay. What do we do with the colloquy on January 30th, 2003, at sentencing, when the government quite correctly tries to seek some clarification, and the judge makes a statement on the record that he finds that the court finds that based upon the answers to the court's questions here today on January 30th, that his waiver of counsel is not knowing and voluntary? Does a waiver of counsel have to be knowing and voluntary to stick? Yes, it does. And there's a finding here based on the behavior of the defendant. He obviously was having trouble. He didn't understand the whole questioning thing, that the waiver was not knowing and voluntary. What do we do with that? I think the Court is simply wrong. His conduct doesn't indicate that his waiver wasn't knowing and voluntary. To prove knowing and an intelligent waiver, you simply have to show that the court advised the defendant of the dangers, the penalties, and the charges against him. And, of course, there was extensive advisements under that rule. And Mr. Ortega-Heron said he understood it. I don't think his conduct demonstrates that he didn't understand the charges or the penalties or the dangers. He maybe may not have known how to behave as a lawyer, but that doesn't mean he didn't even seem to understand when the judge was trying to explain. No, you asked the witness questions, and he didn't seem to be able to do that. He didn't comprehend what that was. I don't think so. I don't think that has anything to do with whether a waiver is knowing and voluntary. There were language problems here, too, clearly, and that may have figured into this. Thank you both very much. Thank you. The case just argued is order submitted, which takes us to United States v. Hilario Ochoa-Perez. Thank you.
judges: Trott, Paez, Berzon